Argued and submitted February 26, 2019; on appeal, general judgment affirmed; on cross-appeal, supplemental judgment reversed and remanded July 14; petition for review allowed November 24, 2021 (368 Or 787) See later issue Oregon Reports

STATE ex rel Ellen F. ROSENBLUM,
in her official capacity as Attorney General
for the State of Oregon,
*Plaintiff-Appellant*
*Cross-Respondent,*

*v.*

LIVING ESSENTIALS, LLC,
a Michigan limited liability company;
and Innovation Ventures, LLC,
a Michigan limited liability company,
*Defendants-Respondents*
*Cross-Appellants.*

Multnomah County Circuit Court
14CV09149; A163980

497 P3d 730

In this action under Oregon's Unlawful Trade Practices Act (UTPA), ORS 646.605 to 646.656, the state appeals a judgment in favor of defendants, manufacturers and sellers of 5-hour Energy® (5-HE) energy drinks, and defendants cross-appeal a supplemental judgment denying their petition for attorney fees under ORS 646.632(8). In its first two assignments of error on appeal, the state contends that the trial court erred in interpreting ORS 646.608(1)(b) and (e) to require proof that defendants' allegedly unlawful trade practices were "material to consumer purchasing decisions." In its third assignment, the state contends that the court erred in not entering judgment for the state on Count 3, involving its decaf formulation of 5-HE, arguing that the court's amended verdict demonstrates that the court found the state's evidence sufficient to establish all of the elements necessary to prove a violation of ORS 646.608(1)(e) as alleged in that count. On cross-appeal, defendants contend that the trial court erred in denying their attorney-fee petition under ORS 646.632(8) because they prevailed at trial and had submitted a satisfactory assurance of voluntary compliance (AVC) prior to institution of the action. *Held*: On the state's appeal, the trial court did not err in concluding that ORS 646.608(1)(b) and (e) implicitly require proof of materiality to consumer purchasing decisions, when those provisions are read in their historical context and in light of constitutional protections on speech. Further, the court's verdict, considered in its entirety and in the context of the parties' arguments, does not demonstrate that the court necessarily found the state's evidence sufficient to establish a violation of ORS 646.608(1)(e) as alleged in Count 3. On defendants' cross-appeal, the trial court erred in concluding that defendants' AVC was not satisfactory within the meaning of ORS 646.632(8); accordingly, the court erred in denying defendants attorney fees.

On appeal, general judgment affirmed; on cross-appeal, supplemental judgment reversed and remanded.

Kelly Skye, Judge.

Carson L. Whitehead, Assistant Attorney General, argued the cause for appellant-cross-respondent. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Michael J. Sandmire argued the cause for respondents-cross-appellants. On the combined answering and cross-opening brief were Lori Irish Bauman, Nena Cook, and Ater Wynne LLP; and Joel A. Mullin and Stoel Rives LLP. On the reply brief on cross-appeal were Michael J. Sandmire, Nena Cook, and Ater Wynne LLP; and Joel A. Mullin and Stoel Rives LLP.

Trenton H. Norris, Raqiyyah R. Pippins, Said O. Saba, Jr., and Arnold & Porter Kaye Scholer LLP; and R. Daniel Lindahl and Bullivant Houser Bailey PC filed the brief *amici curiae* for Council for Responsible Nutrition.

Before Lagesen, Presiding Judge, and DeVore, Judge, and James, Judge.

DeVORE, J.

On appeal, general judgment affirmed; on cross-appeal, supplemental judgment reversed and remanded.

**DeVORE, J.**

The state initiated this action against the defendant producers and sellers pursuant to the Unlawful Trade Practices Act (UTPA), ORS 646.605 to 646.656, alleging that defendants had engaged in a variety of unlawful practices in advertising 5-hour ENERGY® (5-HE) energy drinks. The state generally alleged two types of misrepresentations by defendants: first, that defendants had made misrepresentations concerning the effects of the noncaffeine ingredients in their products, and, second, that defendants had misrepresented the results of a survey of physicians in several "Ask Your Doctor" advertisements, falsely implying that physicians recommended 5-HE to their patients.

After a lengthy bench trial, the trial court entered a verdict and general judgment in favor of defendants on all counts. In a supplemental judgment, the court ruled that, despite prevailing, defendants were not entitled to attorney fees under ORS 646.632(8). The state appeals the general judgment, asserting seven assignments of error; defendants cross-appeal the supplemental judgment denying fees.

On appeal, as explained below, we reject the state's first, second, and fourth assignments of error, obviating the need to address the remaining assignments, and we affirm the general judgment.[1] On cross-appeal, we agree with defendants that the trial court erred in denying attorney fees and therefore reverse and remand the supplemental judgment.

## I.   BACKGROUND

We begin with an introductory discussion of the facts and the history of the case. We elicit more facts as they become appropriate in the analysis of the issues.

Defendants manufacture, market, and sell 5-HE, a two-ounce "energy shot," available in Original, Extra-Strength, and Decaf formulations. At the time of this action, it was being sold nationwide at a rate of approximately nine

---

[1] Because of that disposition, we need not reach defendants' cross-assignments of error raising, among other things, facial and as applied challenges to the UTPA under Article I, section 8, of the Oregon Constitution.

million bottles a week. Original and Extra-Strength 5-HE contain 200 milligrams and 230 milligrams of caffeine, respectively, and a proprietary blend of noncaffeine ingredients (NCI), including B-vitamins, enzymes, amino-acids, and other ingredients. Decaf 5-HE contains six milligrams of caffeine and a different formulation of NCI.

In 2014, the state filed a complaint against defendants alleging violations of the UTPA based on defendants' false or misleading promotional claims with regard to its 5-HE products. The complaint sought civil penalties, disgorgement, restitution, injunctive relief, attorney fees, and costs. *See* ORS 646.632 (authorizing officials to bring action in name of the state; injunctive relief); ORS 646.642 (civil penalties); ORS 646.636 (authorizing court to "make such additional orders or judgments as may be necessary to restore to any person in interest any moneys or property, real or personal, of which the person was deprived by means of any practice declared to be unlawful in ORS 646.607 or 646.608, or as may be necessary to ensure cessation of unlawful trade practices"); *see also Pearson v. Philip Morris, Inc.*, 358 Or 88, 116, 361 P3d 3 (2015) ("A public official bringing an enforcement action may seek, among other possible relief, injunctions, imposition of statutory penalties, and loss of licenses and franchises."). Defendants asserted several affirmative defenses and counterclaimed for attorney fees under ORS 646.632(8), ORS 20.075, and ORS 20.105.

The case proceeded to a bench trial on the state's second amended complaint, which asserted claims for relief under ORS 646.608(1)(e) (counts 1 to 4), ORS 646.608(1)(g) (count 5), ORS 646.608(1)(b) (count 6), and ORS 646.607(1) (count 7).[2] The complaint generally alleged two categories of claims—"(1) claims regarding what [5-HE] does; and (2) claims regarding whether [5-HE] is recommended by doctors." With respect to the first category, the state alleged that defendants misrepresented, in print, internet, television, and radio advertisements, that the NCI contained in

---

[2] The trial court dismissed several of the state's counts before trial on defendants' motions to dismiss. The court denied defendants' several motions for summary judgment as to the claims alleged in the second amended complaint. And, the court agreed to bifurcate the issues of liability and damages.

[5-HE] provided consumers with energy, alertness, and focus, when "any meaningful effect from using [5-HE] as directed comes only from a concentrated shot of caffeine. [5-HE] is simply a caffeine delivery device, and in its Decaf formulation, it is not even that." The second category of claims relate to an "Ask Your Doctor" (AYD) advertising campaign that included website advertising and 30-, 15-, and 10-second television advertisements, which, according to the state "misleadingly implied that doctors had recommended [5-HE] by name in a way that they had not," and, with regard to the online advertising, "made claims about benefits provided by certain ingredients in [5-HE]." The AYD campaign ran for approximately 10 weeks in 2012.

At the close of the state's case, the trial court granted defendants' motion for involuntary dismissal as to two of the counts (counts 5 and 7). Defendants also moved to dismiss the complaint under the free expression guarantee of Article I, section 8, of the Oregon Constitution, asserting facial and as applied challenges; the trial court deferred ruling on those arguments.

The bench trial proceeded to its conclusion on the remaining counts and culminated in a verdict—complete with findings of fact and conclusions of law—in favor of defendants. The state objected to the verdict on various grounds, and defendants requested additional special findings. The trial court issued an order amending the verdict, but the court adhered to its rulings for defendants. The court entered a general judgment in favor of defendants on all of the state's claims.

Defendants filed a statement for attorney fees, costs, and disbursements, alleging an entitlement to fees under ORS 646.632(8) (discussed below). After a hearing, the trial court denied defendants an award of fees and allowed costs and disbursements limited to those not associated with the claim for attorney fees. The court entered a supplemental judgment reflecting that ruling.

The state appeals the general judgment in favor of defendants, and defendants cross-appeal the supplemental judgment denying fees and limiting costs.

## II.   THE STATE'S APPEAL

### A.   *Materiality (First and Second Assignments of Error)*

The state's first and second assignments of error challenge whether, as the trial court held, "materiality" is a requirement in proof of an unlawful trade practice under ORS 646.608(1)(b) and (e). We conclude that it is and, therefore, that the trial court did not err. The state's challenge implicates the trial court's verdicts on counts 1, 4, and 6.[3] We begin by describing those counts and the trial court's resolution of them.

In counts 1 and 4, the state asserted violations of ORS 646.608(1)(e),[4] which makes it an unlawful trade practice to represent that goods "have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities" that the goods do not have. Count 1 alleged that defendants falsely or misleadingly claimed that the NCI in Original and Extra Strength 5-HE "provide consumers with benefits like energy, alertness, or focus." A sample of one of the 5-HE print advertisements at issue reads, in part:

> "To get in the zone—no matter what you're doing—try 5-Hour ENERGY®. It contains the powerful blend of B-vitamins for energy, and amino acids for focus. The two-ounce shot takes seconds to drink and in minutes you're feeling bright, alert and ready for action. And the feeling lasts for hours—without the crash or jitters."

---

[3] As the state recognizes in these assignments of error, the court's application of a materiality requirement also implicates count 3, related to Decaf 5-HE. However, as to that count, the court ruled that any false implications about the NCI in Decaf 5-HE "would necessarily be material to consumer purchasing decisions" because the NCI are the primary ingredients in that product. The court, therefore, did not decide count 3 on the basis of lack of materiality. We address the court's disposition of count 3 when we reach the state's fourth assignment of error.

Not at issue on appeal is the trial court's ruling in favor of defendants on count 2 (alleging that defendants violated ORS 646.608(1)(e) by falsely claiming that Original and Extra Strength 5-HE were superior to consuming an equivalent amount of caffeine from coffee or other sources), dismissal of count 5 (alleging violations of ORS 646.608(1)(g), which prohibits misrepresenting that goods "are of a particular standard, quality, or grade"), and dismissal of count 7 (alleging violations of ORS 646.607(1), which bars "unconscionable tactic[s] in connection with" the sale of goods).

[4] Although ORS 646.608(1) has been amended since the events giving rise to this case, those amendments are immaterial to our analysis. We therefore cite the current version throughout this opinion.

Count 4 also alleged a violation of ORS 646.608(1)(e), but did so with reference to defendants' AYD campaign. Count 4 alleged that defendants "presented the results of a survey [of doctors] in a deceptive manner that would lead consumers to believe doctors had approved of [5-HE] in a way that they had not." As an example, the transcript of the 30-second AYD television advertisement reads:

> "We asked over 3,000 doctors to review Five-Hour Energy and what they said is amazing. Over 73% who reviewed Five-Hour Energy said that they would recommend a low-calorie energy supplement to their healthy patients who use energy supplements. 73%. Five-Hour Energy has four calories and is used over 9 million times a week. Is Five-Hour Energy right for you? Ask your doctor. We already asked 3,000."

Based on the same AYD campaign, count 6 alleged a violation of ORS 646.608(1)(b), which prohibits "[c]aus[ing] likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of * * * goods."

The trial court ruled in favor of defendants on all counts. As relates to the first and second assignments of error, the court determined that the state was required to prove that defendants' unlawful practices, involving misrepresentations (subsection (1)(e)) or causing likely confusion or misunderstanding (subsection (1)(b)), were "material to consumer purchasing decisions," relying on our decision in *State ex rel Rosenblum v. Johnson & Johnson*, 275 Or App 23, 33-34, 362 P3d 1197 (2015), *rev den*, 358 Or 611 (2016). The trial court concluded, as to counts 1, 4, and 6, that the state had failed to carry its burden of proving the materiality of defendants' alleged unlawful practices.

With regard to count 1, the court found that the state failed to prove that defendants' "false representations by implication about the effects of the NCI in [5-HE] were material to consumer purchasing decisions as to the caffeinated versions of [5-HE]." After weighing the competing testimony of the parties' experts, the court found more persuasive defendants' expert, who offered a consumer survey demonstrating that the NCI blend in defendants' caffeinated products is not a significant factor in consumer purchasing

decisions; that most consumers were repeat customers who were satisfied with their experience with the product; that consumer buying was influenced by a multitude of factors, including product effectiveness, taste, convenience, and price.

With respect to counts 4 and 6, the court found that the substantive message in the AYD advertising campaign was not misleading or confusing, *nor* was it material to consumer purchasing decisions. The trial court weighed competing expert and survey evidence and found more persuasive that advertising is not highly influential to consumer purchasing decisions in general; that, in particular, the cessation of the AYD advertising campaign did not cause a drop in sales; that consumers expect bias in a survey touted in advertising; and that the doctors' survey was not represented to be conducted in a scientific or unbiased manner.

In its combined first two assignments of error, the state does not challenge the trial court's ultimate findings that the state failed to prove that defendants' trade practices materially influenced consumer decisions. Instead, the state challenges the trial court's determination that ORS 646.608(1)(e) and ORS 646.608(1)(b) impose that "materiality" element at all. Nothing in the statute, the state asserts, explicitly "requires the state to prove that an unlawful trade practice was 'material to consumer purchasing decisions.'" By requiring such an element, the state contends, the trial court's interpretation violates a core principle of statutory interpretation—"not to insert what has been omitted." ORS 174.010. The state argues that the trial court's reliance on *Johnson & Johnson* was misplaced and that the correct approach is the plain text approach used in *Daniel N. Gordon, PC v. Rosenblum*, 361 Or 352, 357, 393 P3d 1122 (2017) (*Gordon*), which, in the state's view, leads to the conclusion that materiality is not an element of the UTPA violations alleged here. According to the state, the legislature already determined that the types of misrepresentations set out in ORS 646.608(1) are necessarily (just by being listed) material to consumer purchasing decisions as a matter of law. The state contends that the legislature "did not intend to require specific proof of materiality in each individual case,

which can be difficult and expensive." The state urges us to reverse the trial court's judgment as to counts 1, 4, and 6 and remand for the court to apply the state's view of the legal standard.

Defendants respond that the trial court properly applied *Johnson & Johnson* and that the court's ruling is not inconsistent with *Gordon*. Defendants urge that a requirement of materiality to consumer purchasing decisions is "simple common sense," because, otherwise, "all representations about a product would be actionable under the UTPA, regardless of how trivial they may be." Defendants point to decisions from other jurisdictions that "materiality is required to prove deception" under other states' consumer protection statutes.

In a bench trial, an argument that the trial court applied an incorrect legal standard "is akin to an assertion that a trial court delivered an incorrect jury instruction"; accordingly, we review to determine whether the court instructed itself incorrectly as to the law, and, if so, whether the erroneous self-instruction was harmless. *State v. Zamora-Skaar,* 308 Or App 337, 353, 480 P3d 1034 (2020). In this case, that question reduces to whether the trial court properly construed ORS 646.608(1)(b) and (1)(e).

In interpreting a statute, our primary goal is to determine the legislature's intent in enacting it. *State v. Gaines*, 346 Or 160, 171, 206 P3d 1042 (2009); ORS 174.020. We do so by considering the text and context, along with any pertinent legislative history offered by the parties that we find helpful to our analysis. *Gaines*, 346 at 171-72. If the legislature's intent remains unclear, we apply "general maxims of statutory construction." *Id*. at 172. Text and context are the best evidence of the legislature's intent. *Ogle v. Nooth*, 355 Or 570, 578, 330 P3d 572 (2014). Context includes, among other things, prior opinions interpreting the relevant statutory wording and other provisions of the same or related statutes. *Polacek and Polacek*, 349 Or 278, 284, 243 P3d 1190 (2010); *State v. Bluel*, 285 Or App 358, 362, 397 P3d 497 (2017). The court's "prior construction of a statute at issue is an important consideration." *Halperin v.*

*Pitts*, 352 Or 482, 491, 287 P3d 1069 (2012) (citing *State v. Cloutier*, 351 Or 68, 100, 261 P3d 1234 (2011)).

"Oregon's UTPA, like those of many other jurisdictions, was enacted as a comprehensive statute for the protection of consumers from unlawful trade practices." *Pearson*, 358 Or at 115; *see also Denson v. Ron Tonkin Gran Turismo, Inc.*, 279 Or 85, 90 n 4, 566 P2d 1177 (1977) (describing legislative history of UTPA as "support[ing] the view that it is to be interpreted liberally as a protection to consumers"); *Johnson & Johnson*, 275 Or App at 32 ("[T]he UTPA is a remedial statutory scheme that should, to the extent consonant with the *Gaines* construct, be construed so as to effectuate its consumer protection purposes."). It allows for both public and private enforcement. *See* ORS 646.632 (authorizing state enforcement of UTPA provisions and describing state enforcement processes); ORS 646.638(1) (authorizing action by private party to enforce UTPA). In a public enforcement action—in contrast to a private action—the state need not prove that "any consumer has suffered economic loss or other injury as a result of the unlawful practice." *Pearson*, 358 Or at 116; ORS 646.638(1) (setting out "ascertainable loss" requirement for private actions); ORS 646.608(3) (state not required to prove "actual confusion or misunderstanding" to prevail).

ORS 646.608(1) sets out a myriad of unlawful trade practices,[5] two of which are put at issue in this case by counts 1, 4, and 6. Specifically, ORS 646.608(1) provides, as relevant:

"A person engages in an unlawful practice if in the course of the person's business, vocation or occupation the person does any of the following:

"* * * * *

"(b) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of real estate, goods or services.

"* * * * *

---

[5] At present count, ORS 646.608(1) lists approximately 79 such practices. *See Pearson*, 358 Or at 115 ("The trade practices declared unlawful under the UTPA are extensive, too much so for description.").

"(e)   Represents that real estate, goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities that the real estate, goods or services do not have or that a person has a sponsorship, approval, status, qualification, affiliation, or connection that the person does not have."

The opening clause of ORS 646.608(1) thus describes transactions subject to the UTPA, while subsections (1)(b) and (1)(e) describe the particular wrongs at issue here.

As the state emphasizes, neither (1)(b) nor (1)(e) explicitly refers to practices that are "material to consumer purchasing decisions," consistent with the trial court's interpretation.[6] We are not unmindful of the admonition that, in interpreting statutes, we are "not to insert what has been omitted." ORS 174.010. However, that statute also requires us, if possible, to adopt a construction that will "give effect to all" of the statute's provisions. *Id*. And, as always, our ultimate goal is to discern the most likely intent of the legislature. *IAFF, Local 3564 v. City of Grants Pass*, 262 Or App 657, 661, 326 P3d 1214 (2014) ("Where *** the resolution of a dispute requires us to determine the meaning of a statute, our 'paramount goal' is to determine the legislature's intent." (Quoting *Gaines*, 346 Or at 171.)).

As the Supreme Court has recognized, in that pursuit of legislative intent, there are times when the legislature's choice of words naturally implies a requirement that is not otherwise expressly stated in the text. For instance, in *Pearson*, the court held that "reliance" was required to prove causation in a private UTPA claim, given the nature of the unlawful conduct and ascertainable loss alleged, notwithstanding the fact that ORS 646.638(1) does not, "at least by its terms," contain such a requirement. 358 Or at 124-27. The court reasoned that, "[a]s a function of logic, not statutory text, when the claimed loss is the purchase price, and when that loss must be 'as a result of' a misrepresentation, reliance is what 'connects the dots' to provide the key causal

---

[6] Elsewhere in ORS 646.608(1), the word "material" appears only once: Subsection (1)(t), added to the statute after the provisions at issue here, *see* Or Laws 1977, ch 195, § 2, makes it an unlawful practice to, "[c]oncurrent with tender or delivery of any real estate, goods or services[,] fail[] to disclose any known material defect or material nonconformity."

link between the misrepresentation and the loss." *Id.* at 126. *See also Johnson & Johnson*, 275 Or App at 33-34 (concluding that misrepresentation of material "risk" of product defect is actionable misrepresentation of "fact" under ORS 646.608(1)(b), (e), and (g), based largely on legislative intent "manifest[]" in "sweep and scope" of those provisions, and court's obligation to effectuate consumer protective purposes of UTPA to extent possible).

With that in mind, we turn back to the text of the statutory provisions at issue. ORS 646.608(1)(b) makes it unlawful to "cause[] likelihood of confusion or of misunderstanding" as to a product's "source, sponsorship, approval, or certification." The ordinary meaning of the verb "cause" is "to serve as cause or occasion of : bring into existence : MAKE" and "to effect by command, authority, or force." *Webster's Third New Int'l Dictionary* 356 (unabridged ed 2002). The definitions of "confusion" include, as potentially relevant here, "a state of being discomfited, disconcerted, chagrined, or embarrassed esp. at some blunder or check"; "state of being confused mentally : lack of certainty, orderly thought, or power to distinguish, choose, or act decisively : PERPLEXITY". *Id.* at 477. Relatedly, "misunderstanding" means "a failure to understand : MISINTERPRETATION." *Id.* at 1447.

Putting all of that together, for a seller's unlawful trade practice to "bring into existence" or "effect by authority" a "state of being discomfited, disconcerted, chagrined, or embarrassed" or a "lack of certainty" or "power to distinguish, choose, or act decisively" with respect to its product, the unlawful conduct *necessarily* must be material to the consumer's decision to buy the product. Said another way, if a seller's allegedly unlawful practice is immaterial to the consumers' purchasing decisions, it is unlikely to create a state of discomfort, chagrin, or uncertainty, or affect the consumer's power to distinguish, choose, or act decisively with respect to that product.

ORS 646.608(1)(e) makes it unlawful to "represent[]" that products have certain attributes—that is, "sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities"—that they "do not have." The word

"representation" is defined in the UTPA as "any manifestation of any assertion by words or conduct, including, but not limited to, a failure to disclose a fact." ORS 646.608(2).[7] Thus, the crux of the violation under ORS 646.608(1)(e) is a misleading assertion about various attributes that, by their nature, *can* have the potential to affect a purchasing decision, such as sponsorship, approval, characteristics, ingredients, uses, benefits, quantities, or qualities. The statute does not expressly say whether it is limited to attributes that actually do have that potential, or whether it reflects a legislative judgment that *every* misrepresented characteristic—regardless of how innocuous—has the potential to mislead and should constitute a violation of the UPTA. At the very least, the plain text does not foreclose the former interpretation.

Although the text in isolation provides little guidance as to whether the legislature had in mind a materiality requirement, other parts of the UTPA provide additional assistance in determining the legislature's intended meaning. *See Stevens v. Czerniak*, 336 Or 392, 401, 84 P3d 140 (2004) ("[T]ext should not be read in isolation but must be considered in context."); *see also Gordon*, 361 Or at 359 (interpreting the UTPA "as a whole" to determine whether it "applies only to conduct between persons in a customer relationship"). Among the introductory definitions, ORS 646.605(8) provides:

---

[7] In *Searcy v. Bend Garage Company*, 286 Or 11, 14, 592 P2d 558 (1979), the plaintiff brought a claim under ORS 646.608(1)(f) (unlawful practice to "[r]epresent[] that real estate or goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used or secondhand) in connection with an automobile purchase. Among other things, the defendant assigned error to the denial of its requested jury instruction that would have defined "representation" in terms of materiality instead of relying on the definition in ORS 646.608(2). The proposed instruction would have stated, "'A representation is an actual definite statement or actual definite conduct that is *material* and that was relied upon by the plaintiffs. It can also include concealment of a *material* fact that would normally have been relied upon by the plaintiffs and that defendant had a duty to disclose to plaintiffs.'" *Id.* at 16 (emphases in original). The court rejected that instruction, explaining that "in the section defining 'representation' the legislature did not require that a concealed fact be material." *Id.* at 17. The court stated that "[m]any of the enumerated unlawful trade practices involve representations," including ORS 646.608(1)(e), but *Searcy* did not purport to interpret the elements of a claim under any of those paragraphs; its holding was limited to the definition of the term "representation" under ORS 646.608(2) and does not otherwise inform our analysis. *Id.*

"'Trade' and 'commerce' mean advertising, offering or distributing, whether by sale, rental or otherwise, any real estate, goods or services, and include any trade or commerce *directly or indirectly affecting the people of this state*."

(Emphasis added.) The term "trade" thus generally guides our understanding that the "trade" or "commerce" governed by the UTPA is that which "directly or indirectly *affect*[*s*]" consumers. *Id.* (emphasis added).

Relatedly, in relevant part, ORS 646.632(1) provides:

"[A] prosecuting attorney who has probable cause to believe that a person is engaging in, has engaged in, or is about to engage in an unlawful *trade* practice may bring suit in the name of the State of Oregon in the appropriate court to restrain such person from engaging in the alleged unlawful *trade* practice."

(Emphases added.) And, ORS 646.636 provides:

"The court may make such additional orders or judgments as may be necessary *to restore* to any person in interest any moneys or property, real or personal, of which the person *was deprived* by means of any practice declared to be unlawful in ORS 646.607 or 646.608, or as may be necessary to ensure cessation of unlawful *trade* practices."

(Emphases added.) Thus, the UTPA "as a whole" appears to envision that the acts to be remedied as unlawful trade practices are ones that have affected consumers—in other words, ones that materially bear on consumer purchasing choices.

As noted, prior judicial interpretations of a statute can also provide relevant context. Both parties rely heavily on that context here. However, contrary to their respective positions, neither *Johnson & Johnson* (relied on by defendants) nor *Gordon* (advanced by the state) controls the outcome in this case.

*Johnson & Johnson* involved some of the same provisions of the UTPA that are at issue here.[8] 275 Or App at

_____

[8] In addition to claims under ORS 646.608(1)(b) and (e), the state also alleged claims under ORS 646.608(1)(g) and ORS 646.607(1). But "[t]he gravamen of each of those closely related claims was that defendants' misrepresentation of the risk that the product was defective constituted actionable conduct under the UTPA." *Johnson & Johnson*, 275 Or App at 29.

29. But, the question in that case was whether the failure to disclose a material *risk* of a defective product (specifically, that some units of defendants' painkiller Motrin did not dissolve at the required rate for full effectiveness) was actionable under the misrepresentation provisions of the UTPA, specifically, ORS 646.608(1)(b), (e), and (g). *Id*. at 31. We rejected the defendants' position that the UTPA "does not prohibit representations that are 'merely at risk' of being untrue," *id*., and held that the risk of product defect was instead a "fact" under those provisions and the failure to disclose it was therefore actionable, *id*. at 34. Along the way, we observed that the wide array of factual misrepresentations encompassed in the statutory language "manifests the legislature's intent to broadly prohibit misrepresentations *materially bearing on consumer purchasing choices*." *Id*. at 33-34 (emphasis added). We did not, however, hold that the state was required to prove the same as an element of a UTPA violation. We stated:

> "The sweep and scope of those provisions—both with respect to the form and content of misrepresentations—manifests the legislature's intent to broadly prohibit misrepresentations materially bearing on consumer purchasing choices. A material risk that a product has a latent defect is exactly the kind of inherent feature of a product implicated under ORS 646.608(1) and (2). If a product is advertised and sold as effective for its intended use, notwithstanding a known risk that the product may not be fully effective, that risk itself is a 'fact' for purposes of the UTPA, and its nondisclosure is actionable under the UTPA."

*Id*. Thus, although it provides some support for defendant's (and the trial court's) reading of the statute, *Johnson & Johnson* does not *compel* the conclusion that "material to consumer purchasing decisions" is a required component of a violation under subsections (1)(b) or (e).

      *Gordon*, to which the state points, is also not dispositive of that question. In *Gordon*, the Supreme Court considered whether the UTPA applied to the debt collection activities of a lawyer and his law firm. As relevant here, the issue involved only ORS 646.608(1)(b), on causing likely "confusion" or "misunderstanding," as it applied to loans and credit. 361 Or at 354. In summary, the court agreed with the

state that the statute, on its face, required three elements: "(1) 'a person' (2) 'in the course of the person's business, vocation or occupation' (3) '[c]auses likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of, among other things, a 'loan or extension of credit.'" *Id.* at 367 (brackets in *Gordon*). Although the court's summary recitation of the elements did not include materiality, the court was not asked to consider whether such a requirement may be implicit in a claim under the statute. That question was not before the court.

With that uncertain landscape, we turn to the legislative history. Although neither party refers us to any history pertaining to ORS 646.608(1)(b) and (e), those subsections, in substantially the same form,[9] were part of the original enactment of the modern version of the UTPA in 1971.[10] Or Laws 1971, ch 744, § 7. The language of the unlawful practices listed in ORS 646.608(1)(a) to (j) was "largely borrowed" from the Uniform Deceptive Trade Practices Act (UDTPA).[11] *Denson*, 279 Or at 90 n 4. As the court noted in *Denson*, the UDTPA focused on "identifying business conduct which is in unfair competition with other businesses," while the history of the UTPA indicates that the Oregon legislature was *consumer* protective. *Id.* ("[T]he legislative history of the Oregon Unlawful Trade Practices Act supports the view that it is to be interpreted liberally as a protection to consumers."). Because of those different policy underpinnings, the *Denson* court also indicated that interpretations of the UDTPA were

---

[9] There have been some changes since, for example, the addition of "real estate" to the description of deceptive practices listed in ORS 646.608(1), including in paragraphs (b) and (e). *See* Or Laws 1973, ch 235, § 2. However, for our purposes, the changes are immaterial.

[10] For a brief description of Oregon's consumer fraud statute prior to 1971, see Ralph James Mooney, *The Attorney General as Counsel for the Consumer: The Oregon Experience*, 54 Or L Rev 117, 118-19 (1975).

[11] One writer has commented that Oregon adopted a "somewhat amended version" of the Federal Trade Commission's proposed Unfair Trade Practices and Consumer Protection Law (UTPCPL), which was recommended by the Council of State Governments. Mooney, 54 Or L Rev at 119-20, 119 n 13 (citing UTPCPL, *reprinted in* Council of State Governments, 1970 Suggested State Legislation 141); *see also id.* at 121 (noting that Oregon chose the third alternative offered by the UTPCPL and that subsections (a) through (j) of ORS 646.608(1) were adopted "nearly verbatim" from the UTPCPL. Apparently, in that respect, the language of the UDTPA and the UTPCPL were the same.

therefore "of limited value" in discerning the legislature's intent with respect to Oregon's UTPA.[12] *Id.*

That does not tell the entire story, however. As the court recognized in *Denson*, Oregon, in any event, largely adopted the list of deceptive trade practices from the UDTPA. More particularly, in enacting ORS 646.608(1)(b) and (e), the legislature very closely tracked the language of sections 2(a)(2) and (5) of the UDTPA. Uniform Deceptive Trade Practices Act, 54 Trademark Rep 897, 899-901 (1964).[13] And those provisions, in turn, were derived from, among other sources, the *Restatement (Second) of Torts* and section 43(a) of the federal Lanham Act, 15 USC § 1125(a) (1958). *See* Uniform Deceptive Trade Practices Act § 2(a)(2) comment, 54 Trademark Rep at 899 (noting that "[t]he 'likelihood of confusion' test is referred to in the Restatement (Second), Torts § 729, comment *a* (Tent. Draft No. 8, 1963) as 'a phrase which has long been used in statutes, Federal and State, and in court opinions'"); Uniform Deceptive Trade Practices Act § 2(a)(5) comment, 54 Trademark Rep at 900 (explaining that the subsection "deals with false advertising of goods, services or businesses," referencing, *inter alia*, "Restatement (Second), Torts § 712, comment *d* (Tent. Draft No. 8, 1963),"

---

[12] Although, as the court observed in *Denson*, the UDTPA's *emphasis* was on the protection of businesses from unfair competitive advertising practices; it effectively protected consumers as well. *See* Richard F. Doyle, Jr., *Merchant and Consumer Protection: The Uniform Deceptive Trade Practices Act*, 76 Yale L J 485, 489 (Jan 1967) (suggesting that UDTPA required a showing, among other things, that the misrepresentation "actually deceives or has the tendency to deceive a substantial segment of its audience, that the deception is likely to make a difference in the purchasing decision, and that the particular plaintiff has been, or is likely to be injured by the deception").

[13] Section 2(a) of the UDTPA provided, as relevant:

"A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he:

"* * * * *

"(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

"* * * * *

"(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have[.]"

54 Trademark Rep at 899-900. In contrast to section 2(a)(5), ORS 646.608(1)(e) also includes misrepresentations as the "qualities" of a product or the "qualification" of a person.

and noting that section 43(a) of the Lanham Act "authorizes similar private actions").

Those sources are consistent with what the text and context suggest to us, which is that the legislature would have understood unlawful trade practices to be ones that have the potential to affect consumers—in other words, ones that materially bear on consumer purchasing choices. In particular, section 43(a) of the federal Lanham Act contemplated that the prohibited deception be material to a consumer's purchasing decisions. As one commentator has noted, "despite the unqualified language" of the "false advertising sections" of the UDTPA

> "decisions under analogous § 43(a) of the federal Lanham Trademark Act[14] suggest that a person who invokes these false advertising provisions will have to show that the defendant's advertisement is a false representation of 'fact,' that it actually deceives or has the tendency to deceive a substantial segment of its audience, *that the deception is likely to make a difference in the purchasing decision*, and that the particular plaintiff has been, or is likely to be injured by the deception."

Richard F. Doyle, Jr., *Merchant and Consumer Protection: The Uniform Deceptive Trade Practices Act*, 76 Yale L J 485, 489 (Jan 1967) (emphasis added; footnote omitted).[15]

---

[14] At the time, section 43(a) of the Lanham Act provided:

"Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation."

60 Stat 441 (1946), 15 USC § 1125(a) (1952).

[15] Doyle references Gilbert H. Weil, *Protectability of Trademark Values against False Competitive Advertising*, 44 Calif L Rev 527, 537 (1956), in support of that position. Doyle, 76 Yale L J at 489 n 22. Tracing the development of case law following the enactment of section 43(a) of the Lanham Act, Weil asserts that, for a plaintiff to prevail on a claim of false competitive advertising based upon a showing of *likelihood* of damage, the plaintiff must be prepared to establish the factors suggested by Doyle, including that the false advertising has a tendency

In light of the clear purpose behind the UTPA to protect consumers, it is likely that the legislature intended a similar materiality requirement to be implicit in the subsections drawn from the UDTPA, including ORS 646.608(1)(b) and (e). All sources agree that Oregon's UTPA is first and foremost a consumer protection statute. *See* 313 Or App at 185 (citing cases stating that principle). The UTPA and cases from *Denson,* through *Johnson & Johnson*, to *Pearson*, recognize that the UTPA is intended to protect consumers in their purchasing decisions. As a consequence, it is difficult to imagine how making actionable *immaterial* misrepresentations under ORS 646.608(1)(b) and (e) would serve to accomplish the purpose of the UTPA to prevent consumers from harm. There is no need to provide a remedy for misrepresentations that are irrelevant to consumers' purchasing decisions to accomplish the goal of protecting consumers.[16]

To the extent that there is any remaining uncertainty after examining the legislative history, however, canons of statutory construction resolve the question. *See State v. Rodriguez*, 217 Or App 24, 33, 175 P3d 471 (2007) ("Even assuming that the legislative history is not sufficiently illuminating of the legislature's intentions, all that means is that we resort to canons of construction to resolve the ambiguity."). The canon calling for the avoidance of constitutional issues is especially apt here. Under that canon, "when one plausible construction of a statute is constitutional and another plausible construction of a statute is unconstitutional, courts will assume that the legislature intended the constitutional meaning." *State v. Kitzman*, 323 Or 589, 602, 920 P2d 134 (1996). It is not necessary that the constitutional argument would necessarily prevail; rather, it may be invoked where "there is even a tenable argument of unconstitutionality. *Westwood Homeowners Assn., Inc. v. Lane County*, 318 Or 146, 160, 864 P2d 350 (1993), *adh'd to as modified on recons*, 318 Or 327, 866 P2d 463 (1994) (rejecting

---

to deceive, and that "*the deception is material, in the sense that it is likely to make a difference in the purchasing decision*." Weil, 44 Calif L Rev at 533-37 (emphasis added).

[16] For that reason and those above, we disagree with the state that the legislature already defined those aspects of goods that are necessarily material to consumer purchasing decisions in its description of unlawful practices in the statute.

proposed interpretation that 'arguably would infringe on the constitutional rights' of parties)." *Rodriguez*, 217 Or App at 34.

Here, reading ORS 646.608(1)(b) and (e) as the state suggests—that is, without a materiality requirement—raises more than just a tenable possibility that the statute would run afoul of Article I, section 8.[17] Under Article I, section 8, a statute "written in terms directed to the substance of any 'opinion' or any 'subject' of communication" is invalid on its face, unless it fits "wholly *** within some historical exception." *State v. Robertson*, 293 Or 402, 412, 649 P2d 569 (1982). Regardless of whether subsections (1)(b) or (e) fit within the historical exception for fraud if we were to read a materiality requirement into the statute, without that requirement, serious constitutional questions are patent; common-law fraud is a tort of deception and has always required that a representation or omission have some potential to deceive.[18] *See, e.g.*, *Conzelmann v. N. W. P. & D. Prod. Co.*, 190 Or 332, 350, 225 P2d 757 (1950) ("Comprehensively stated, the elements of actionable fraud consist of: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; (9) and his consequent and proximate injury."); *see also State ex rel Redden v. Discount Fabrics*, 289 Or 375, 384-85, 615 P2d 1034 (1980) (examining differences between fraud and UTPA); *Wolverton v. Stanwood,* 278 Or 709, 713, 565 P2d 755 (1977) ("The elements of common law fraud are

---

[17] Article I, section 8, provides, "No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

[18] In connection with defendants' cross-assignments of error—which we are not required to reach—the parties dispute whether ORS 646.608(1)(e) and (b) are within the historical exception for fraud because subsection (1)(e) does not require proof that speech about a product is *knowingly* false and subsection (1)(b) does not require a false statement. Given our disposition, we are not required to reach those cross-assignments of error. Further, we emphasize that we are not conclusively resolving the question whether, in the absence of a materiality requirement, subsection (1)(b) or (1)(e) would violate Article I, section 8, only that interpreting the provisions in that fashion would present such a stark possibility of constitutional infirmity that we are called upon to avoid the question.

distinct and separate from the elements of a cause of action under the Unlawful Trade Practices Act and a violation of the Act is much more easily shown.").

Without a materiality requirement, the effect of the statute would be to punish commercial speech that has no potential to mislead a reasonable consumer. For purposes of Article I, section 8,

> "[i]f the enactment's restraint on speech or communication lies outside an historical exception, then a further inquiry is made—whether the actual focus of the enactment is on an effect or harm that may be proscribed, rather than on the substance of the communication itself. If the actual focus of the enactment is on such a harm, the legislation may survive scrutiny under Article I, section 8. *** If such a statute expressly prohibits certain forms of expression, it must survive an overbreadth inquiry before it can be found constitutional."

*State v. Stoneman*, 323 Or 536, 543, 920 P2d 535 (1996). To the extent subsection (1)(b) or (1)(e) would be considered such a "*Robertson* category two" law—that is, aimed at preventing harm to consumers—absent an element of proof that the prohibited speech was "material to consumer purchasing decisions," it would be susceptible to an overbreadth challenge. *See State v. Moyle*, 299 Or 691, 701-02, 705 P2d 740 (1985) (category two statute violates Article I, section 8, if it "potentially reaches substantial areas of communication that would be constitutionally privileged and that cannot be excluded by a narrowing interpretation or left to a case-by-case defense against the application of the statute").[19]

In sum, although the phrase "material to consumer purchasing decisions" does not appear in ORS 646.608 (1)(b) or (e) when viewed in isolation, for all of the reasons discussed above, we conclude that it is necessarily implicit

---

[19] Arguably, the absurd-results canon also comes into play. Punishing a seller for *any* misrepresentation or cause of confusion about a product, even where that conduct would have no bearing on consumers' purchasing decisions, is nonsensical, and especially so, when viewed in the light of the purposes behind the UTPA. *See State v. Vasquez-Rubio*, 323 Or 275, 282-83, 917 P2d 494 (1996) (explaining that absurd results maxim is "best suited for helping the court to determine which of two or more plausible meanings the legislature intended," and, "[i]n such a case, the court will refuse to adopt the meaning that would lead to an absurd result that is inconsistent with the apparent policy of the legislation as a whole").

in the provisions when they are read in their historical context and in light of constitutional protections on speech. An allegation that an unlawful practice "causes likelihood of confusion" (ORS 646.608(1)(b)) or involves misrepresentation (ORS 646.608(1)(e)) requires proof that the unlawful practice is one that would materially affect consumers' buying decisions.

As to the first two assignments of error involving counts 1, 4, and 6, we determine that the trial court did not err in considering the evidence to determine whether defendants' representations materially affected consumer decisions. We conclude that the trial court did not err in reaching a verdict and dismissing counts 1, 4, and 6.[20]

B.  *Decaf 5-HE (Fourth Assignment of Error)*

Our conclusion that the trial court did not err in imposing a materiality requirement under ORS 646.608(1)(b) and (e) disposes of the need to address all but one of the state's other assignments of error on appeal. We still must address the fourth assignment. The state contends that the trial court erred in failing to enter a verdict in the state's favor on count 3, which alleged misrepresentations about the effects of Decaf 5-HE. We address that assignment because, as noted earlier, the court concluded, as to count 3, that any false implications about the NCI in that product would necessarily be material to consumer purchasing decisions. Our conclusion as to materiality (regarding counts 1, 4, and 6) does not forestall the need to address the state's challenge to the court's disposition of count 3.

In count 3, the state alleged that defendants represented that Decaf 5-HE has "characteristics, uses, benefits, and qualities that it does not have when they falsely or misleadingly claimed that it provides benefits like energy, alertness, or focus," in violation of ORS 646.608(1)(e). Realleging and incorporating its earlier allegations for purposes of count 3, the complaint further alleged:

---

[20] As noted, the state does not argue that, if proof of materiality is required to establish a UTPA violation under ORS 646.608(1)(b) or (e), the trial court erred in determining that the state failed to satisfy that element of proof as to counts 1, 4, and 6.

"Another way in which Defendants misrepresent the way that [5-HE] works (or does not work) is by claiming that the Decaf formulation of the product provides any of the promoted benefits, when it does not. These claims are misleading because Decaf [5-HE] provides *no* feeling of extra energy, alertness, or focus. The only ingredient in Defendants' line of products that provides any meaningful effect when taken as directed is caffeine, and the amount of caffeine in Decaf [5-HE] is insufficient to have a physiological effect in most consumers."

(Emphasis added.) The complaint also alleged that defendants' website claims (with respect to all of its formulations of 5-HE, including Decaf 5-HE)—that 5-HE lasts longer than other canned energy drinks, and "can help you feel bright, alert and focused for hours without the crash," were misleading, "because in reality, it is only caffeine that provides *any* claimed effect for [5-HE] consumers." (Emphasis added.)

As discussed earlier, after trial, the court filed an initial "Verdict, Findings of Fact and Conclusions of Law"; the parties filed objections; and the court issued an order with revised findings and conclusions. Some of the court's initial findings about the NCI in Decaf 5-HE were made in examination of count 1 and later referenced in the examination of count 3. Both counts involved the allegation that the NCI fail to provide consumers with benefits like energy, alertness, or focus. As noted, the NCI refer to, among other things, B-vitamins and amino-acids. The expert evidence presented at trial primarily consisted of the testimony of Dr. Martindale and Professor Kennedy. The court observed, "Both experts agree that B-vitamins and amino-acids play essential roles in the human body's production of energy." The court found, however, that the experts differed on whether the NCI would "provide any noticeable or measurable feeling of energy *during the five hours* following ingestion of the product." (Emphasis added.) The trial court was persuaded by the state's view that NCI do not produce feelings of energy and alertness "*during* the five hours following consumption." (Emphasis added.) The court then made a careful distinction that the difference between immediate effect and potential long-term benefit depended upon the

nature of the allegation presented. Speaking of the differ-
ence, the court explained:

> "Nevertheless, the truth or falsity of Defendants' adver-
> tising claims and whether they are actionable as related
> to B-vitamins and amino-acids *depends specifically on
> how each claim is presented*. For example, 'B-vitamins for
> energy,' is not an inherently false representation, as the
> body does require B-vitamins in order to produce energy.
> What may be false is the implication that the specific
> dosage of B-vitamins in a given bottle of 5HE will have a
> noticeable effect on the energy level of a consumer, absent
> caffeine, *during* the five hours following consumption.
> Similarly, 'Amino Acids for alertness,' is not an inherently
> false representation, but the implication that the specific
> dosage of amino-acids in the bottle of 5HE will produce
> measurable alertness *during* the five hours following con-
> sumption is, more likely than not, false."

(Emphases added.)

Turning from count 1 to count 3, the trial court
found that only one shipment of Decaf 5-HE was delivered
in Oregon.[21] That shipment was one case containing 216 bot-
tles, which sold for $302.40. The trial court made findings as
to Decaf 5-HE that referred back to the prior findings about
B-vitamins and amino-acids. The court made the following
findings about count 3—initial findings, which, after objec-
tions, it would revise:

> "The State alleges that Defendants made false repre-
> sentations in Oregon about the effect of Decaf 5HE. * * *
> Neither of those representations about Decaf 5HE are nec-
> essarily false following the previous analysis, but they do
> carry some false implications as to the effect of the spe-
> cific NCI in a bottle of Decaf 5HE. The greater weight of
> the evidence establishes that the NCI, or B vitamins and

---

[21] The court referenced two exhibits, Exhibits 83 and 252. Exhibit 83 is the
"Supplement Facts" panel on the bottle label, which lists the product's ingredi-
ents and their "% Daily Value." Exhibit 252 is the label itself; it states:

> "SENSITIVE TO CAFFIENE? Still need extra energy to get you through
> your day? Decaf 5-Hour Energy can provide hours of alertness and focus
> without making you feel jittery."

The label also says, "Hours of energy now—No crash later"; "Feel it in minutes ·
Lasts for hours"; "Drink one half (1/2) bottle for moderate energy"; "Drink one
whole bottle (two ounces) for maximum energy."

amino-acids in Decaf 5HE do not provide five hours of energy following consumption. The false implications about the NCI in the Decaf 5HE would necessarily be material to consumer purchasing decisions as the NCI are the primary ingredients, other than five milligrams of caffeine.

"To recover civil penalties for a violation of the UTPA, the State must prove that a violation was willful. For the same reasons indicated in Count 1, I find that any implications of falsity in Defendants' advertising claims about the NCI in Decaf 5HE were not willful."

(Footnote omitted.)

The state objected to those findings in the verdict, arguing that the court had essentially found all of the elements of a UTPA violation as alleged in count 3; that willfulness is only an element for obtaining the remedy of civil penalties,[22] and that, therefore, the court should enter a verdict for the state on count 3.[23]

Defendants contended in response that the court correctly ruled in their favor, because the state failed to prove that the alleged misrepresentations were objectively false. Acknowledging the court's adverse finding that the "greater weight of the evidence" was that the NCI in Decaf 5-HE "do not provide five hours of energy following consumption," defendants asserted that the state had never alleged that defendants' representations about the *duration* of benefits from Decaf 5-HE were false. Rather, defendants argued—pointing to the complaint, the state's trial memorandum, and the state's argument at trial—that the state's allegations were based on the theory that the statements were false because NCI have *no effect at all*, and the duration of benefits from the NCI was beyond the scope of the allegations of count 3. *See Hurlbutt v. Hurlbutt*, 36 Or App 721, 725, 585 P2d 724 (1978), *rev den*, 285 Or 73 (1979) ("In

---

[22] *See* ORS 646.642(3) ("In any suit brought under ORS 646.632, if the court finds that a person is willfully using or has willfully used a method, act or practice declared unlawful by ORS 646.607 or 646.608, the prosecuting attorney, upon petition to the court, may recover, on behalf of the state, a civil penalty to be set by the court of not exceeding $25,000 per violation.").

[23] As mentioned earlier, the court bifurcated the penalty and remedy phases of the trial. Having found in favor of defendants on all counts, the trial never reached a remedy phase.

law or equity, a decree or judgment must be responsive to the issues framed by the pleadings and a trial court has no authority to render a decision on issues not presented for determination."); *see also Central Oregon Fabricators, Inc. v. Hudspeth*, 159 Or App 391, 403, 977 P2d 41, *rev den*, 329 Or 10 (1999) (concluding that trial court erred in granting plaintiff relief on an unpleaded theory, citing *Hurlbutt*). According to defendants, the court ultimately held that defendants prevailed on count 3, and that holding was supported by the court's overall findings.

After considering the objections from both parties, the trial court issued an order confirming the verdict for defendants, but "amend[ing] and clarif[ying]" its finding of fact in the paragraph quoted above. The revised paragraph found (new wording in italics):

> "Neither of those representations about Decaf 5HE are necessarily false following the previous analysis, but they *may* carry some false implications as to the effect of the specific NCI in a bottle of Decaf 5HE. The greater weight of the evidence establishes that the NCI, or B vitamins and amino-acids in Decaf 5HE do not provide *the claimed effects during the* five hour *period* following consumption. *This phrase is intended to specify that the period of time during which the claimed effect would be measured is one that is immediately following consumption*[.]"

On appeal, the state reprises its argument from below, contending that the trial court legally erred in not entering judgment for the state on count 3, because the amended verdict establishes that the court found all of the elements necessary to establish a violation of ORS 646.608(1)(e), *i.e.*, that defendants represented that Decaf 5-HE has "characteristics, ingredients, uses, benefits, quantities, or qualities" that it does not have. In particular, the state contends that the court found the state's evidence sufficient to establish that defendants' claims about the effects of NCI were false. As they did below, defendants disagree with the state's reading of the findings made in the verdict. In addition, they argue that, even if the state is correct, the representations at issue are nonactionable puffery.

On appeal from a bench trial, "we review the trial court's findings of fact for any evidence to support them,

*Illingworth v. Bushong*, 297 Or 675, 694, 688 P2d 379 (1984),
and its legal conclusions for errors of law." *Allco Enterprises
v. Goldstein Family Living Trust*, 183 Or App 328, 330, 51
P3d 1275 (2002). Here, the state does not challenge the suffi-
ciency of the evidence to support the court's findings; rather,
it insists that those findings compel—as a matter of law—a
verdict in the state's favor. We disagree.

Although the trial court's initial and revised find-
ings invite misunderstanding, we consider the verdict in its
entirety and its place in the context of the parties' argu-
ments. Accordingly, we do not understand the court to have
found that defendants' representations with regard to Decaf
5-HE were objectively false in the way in which count 3 was
alleged. *See, e.g.*, *State v. Spieler*, 302 Or App 432, 439-40,
460 P3d 535 (2020) (concluding that court's speaking ver-
dict, although not entirely clear, did not reveal a fundamen-
tal misunderstanding of the law considering the verdict as
a whole and the parties' arguments; in light of the emphasis
on the issue at trial, it was "highly unlikely" that the court
misunderstood the legal standard); *State v. Reed*, 299 Or
App 675, 689, 452 P3d 995 (2019), *rev den*, 366 Or 382 (2020)
("[T]he court's speaking verdict and other comments must
be considered in context, taking into account the circum-
stances in which the court made its observations and the
extent to which the court's explanation of its verdict sheds
light on how it viewed the evidence.").

When the initial and revised findings are read
together, they indicate that the court found that the claims
on the label were not "necessarily false," referencing its
analysis in connection with count 1 (involving Regular and
Extra Strength 5-HE). In that discussion, after reviewing
the expert evidence presented at trial, the court explained
that the truth or falsity of defendants' advertising claims
related to B-vitamins and amino acids would depend on
how each claim was presented. "For example," the court
observed, "'B-vitamins for energy' is not an inherently false
representation, as the body does require B-vitamins in order
to produce energy. What may be false is the implication
that the specific dosage of B-vitamins in a given bottle of
5HE will have a noticeable effect on the energy level of a

consumer, absent caffeine, during the five hours following consumption."

The court recognized that defendants' representations "*may* carry some false implications as to the effect of the specific NCI in a bottle of Decaf 5HE." (Emphasis in original.) In response to precisely the same point that the state now makes on appeal—that the court should have entered judgment for the state because it had found all of the elements necessary for a UTPA violation—the trial court revised its finding in that regard from the definitive to the merely possible (replacing "do" with "may"), and confirmed its verdict for defendants. That strongly suggests that the court found the state's evidence as to falsity lacking.

The state, predictably, focuses on the court's next statement—that "[t]he greater weight of the evidence establishes that the NCI, or B vitamins and amino-acids in Decaf 5HE do not provide the claimed effects during the five hour period following consumption"—to advance the contrary position. (Emphasis omitted.) However, again, that finding was revised in response to the parties' arguments in objection to the verdict. The court had originally found that the NCI "do not provide five hours of energy following consumption." The court revised that language to reference the claimed NCI effects during the five-hour period after consumption. And, again significantly, the court in its amended verdict specifically clarified that the phrase, as revised, was meant to specify that the relevant time period for assessing the claimed effects is that immediately after consumption. Together, we think those amendments indicate the court's acceptance of defendants' argument—which the state does not address, much less dispute—that the state's theory of liability in count 3 was not that defendants falsely represented the duration of the effects from the NCI, but that the NCI have any effect on alertness or energy *at all*.[24] In other words, we understand the trial court to have found the evidence sufficient to establish that the NCI provide some benefit to energy, alertness, and focus immediately following

---

[24] We note that that is borne out by the record—as noted above, the state alleged that the NCI provide *no* feeling of extra energy or alertness, and that it is only caffeine that provides any of the claimed effects.

consumption, such that defendants' representations were not false in the manner advanced by the state.

Finally, as it did below, the state suggests that the court may have denied it relief—even though it had found all the elements for a violation—because the court found that the state had failed to prove that the violation was willful, although willfulness is required only for the state to obtain civil penalties, not for the other forms of relief it sought. We are not taken by that argument either. The court's finding explicitly recognizes the limitation emphasized by the state: "*To recover civil penalties* for a violation of the UTPA, the State must prove that a violation was willful." (Emphasis added.) And, as the state acknowledges, the court also made a finding as to willfulness with respect to count 1, in which, as discussed above, the court found no violation because the state's proof failed on the materiality element. In the context of the entire verdict, we understand the court to have adopted a "belt and suspenders" approach in its verdict—not surprisingly, given the complexity of the case, the interrelated issues, and the likelihood that one or more of the court's rulings were likely to be appealed. We do not understand the court to have improperly based its verdict on a misunderstanding that, although the state had proved that defendants' representations were false, it was also required to prove that defendants acted willfully for anything *other* than the purpose of obtaining civil penalties.

In sum, although the trial court's particularity of findings could be misunderstood, we are not convinced, after considering, in the context of the record as a whole, the parties' arguments in objection to the verdict, and the court's ensuing response, that the trial court misunderstood or misapplied the law. Therefore, we reject the state's fourth assignment of error and do not disturb the verdict for defendants on count 3.

### III.   DEFENDANTS' CROSS-APPEAL

Defendants cross-appeal the supplemental judgment denying them attorney fees under ORS 646.632(8). The statute provides, in part:

"If the defendant prevails in [an action brought by the prosecuting attorney under ORS 646.632] and the court finds

that the defendant had in good faith submitted to the prosecuting attorney a satisfactory [AVC] prior to the institution of the suit * * *, the court shall award reasonable attorney fees at trial and on appeal to the defendant."

Defendants contend that they are entitled to fees because their AVC was satisfactory and that, in concluding otherwise, the trial court applied an incorrect legal standard. The state responds that the trial court was correct—either as a matter of law or according to the standard the court used. As we explain below, we agree with defendants and, therefore, reverse and remand the supplemental judgment.[25]

Generally, before filing a public UTPA action under ORS 646.632(1), "the prosecuting attorney shall in writing notify the person charged of the alleged unlawful trade practice and the relief to be sought."[26] ORS 646.632(2). The person charged then has ten days to submit to the prosecuting attorney an AVC "set[ting] forth what actions, if any, the person charged intends to take with respect to the alleged unlawful trade practice." *Id.* The AVC is not considered an admission of a violation. *Id.* Essentially, it is a settlement offer. Then, if the prosecuting attorney is satisfied with the AVC, it may be submitted to the court for approval; upon signature by the court, it is entered in the register and thereafter constitutes a judgment in the favor of the state, enforceable as provided in ORS chapter 18. *Id.* Under ORS 646.632(3), the prosecuting attorney may reject as unsatisfactory an AVC:

"(a)  Which does not contain a promise to make restitution in specific amounts or through arbitration for persons who suffered any ascertainable loss of money or property as a result of the alleged unlawful trade practice; or

---

[25] Defendants conclude that the case must be remanded to the trial court for "application of the proper legal standard." Defendants' principle argument, in substance, however, is that the AVC was satisfactory as a matter of law. That is, defendants contend that there was no legal basis for the court to have concluded otherwise. With that, we agree, and, therefore, we remand for the trial court to determine the amount of defendants' reasonable attorney fees and costs.

[26] There are exceptions to the notice requirement that do not apply here. *See* ORS 646.632(5), (6). Also, "'[p]rosecuting attorney' means the Attorney General or the district attorney of any county in which a violation of [the UTPA] is alleged to have occurred." ORS 646.605(5). In this case, the prosecuting attorney is the Attorney General. Accordingly, we refer to "the state" and "the prosecuting attorney" interchangeably.

"(b)   Which does not contain any provision, including but not limited to the keeping of records, which the prosecuting attorney reasonably believes to be necessary to ensure the continued cessation of the alleged unlawful trade practice, if such provision was included in a proposed assurance attached to the notice served pursuant to this section."

Violation of an approved AVC constitutes contempt of court. ORS 646.632(4). And, "[a]ny person who willfully violates any provision of an [AVC] approved and filed with an appropriate court under ORS 646.632 shall forfeit and pay to the state a civil penalty to be set by the court of not more than $25,000 per violation." ORS 646.642(2).

If the prosecuting attorney rejects the AVC, and the defendant ultimately prevails in the UTPA action, "the court *shall* order reasonable attorney fees at trial and on appeal to the defendant" if, as relevant here, "the court finds that the defendant had in good faith submitted to the prosecuting attorney a satisfactory [AVC] prior to the institution of the suit." ORS 646.632(8) (emphasis added).[27]

Consistent with that statutory scheme, the state notified defendants of the alleged UTPA violations and its intention to seek civil penalties, restitution "to anyone harmed by [defendants'] acts," injunctive relief, and attorney fees and costs. Defendants timely submitted an AVC in which, in paragraph 11, they agreed to "obey Oregon's Unlawful Trade Practices Act, ORS 646.605 to ORS 646.656." The AVC also provided, in paragraph 12, that defendants

"shall not make any express or implied claim, statement, or representation in connection with the marketing or advertising of [5-HE] Products in the United States, including through the use of an endorsement, depiction, or illustration, *that contains material representations that are false or mislead consumers acting reasonably to their detriment; or omits material information such that the express or implied claim, statement, or representation deceives consumers acting reasonably to their detriment.*"

---

[27] ORS 646.632(8) also provides for a *discretionary* award of attorney fees to the prevailing party, which defendants here also requested, and the court likewise denied. That ruling is not at issue on appeal.

(Emphasis added.) As to payment of restitution, paragraph 21 of defendants' AVC stated:

> "Within 30 days of execution of the AVC, and as consideration for DOJ's role on the Executive Committee of states evaluating [defendants'] compliance with the various consumer protection laws, [defendants] *shall pay the sum of $250,000 to the DOJ to be used by the State of Oregon as allowed by law, including, but not limited to, restitution, consumer education, the Consumer Protection & Education Account established pursuant to ORS 180.095, or charitable purposes*. In the event the DOJ joins the Assurance of Voluntary Compliance entered into between [defendants] and the Attorney General of the State of Ohio (the 'Ohio AVC'), and pursuant to the Ohio AVC the DOJ is entitled to a sum larger than $250,000, [defendants] shall pay the larger of the Ohio AVC amount or $250,000 to the DOJ in full satisfaction of this AVC and the Ohio AVC."[28]

(Emphasis added.)

The state rejected the AVC on the grounds that "it does not provide restitution for Oregon consumers and because it does not provide sufficient assurances that [defendants] will not re-offend." The state explained that the proposed injunctive terms were problematic because they would hold defendants to a different standard for future conduct than the UTPA requires—in particular, that the "consumers acting reasonably to their detriment" test would hold defendants to a lower standard than that of most state consumer protection laws, including the UTPA. The state also explained that, relative to defendants' size and income, the proposed payment was "insufficient to provide meaningful deterrence to future misconduct." In its email rejecting the AVC, the state suggested terms that would be required for settlement, including "a mechanism for consumer restitution of [5-HE's] decaffeinated product."

Two weeks later, the state filed its initial UTPA complaint against defendants. As we know now, the case went to trial on the state's second amended complaint and defendants ultimately prevailed on all claims. Defendants

---

[28] The Ohio AVC, which apparently provided for a $1,000,000, charitable donation to a mutually agreed upon hospital, was not finalized until after the state rejected defendants' AVC in this case.

subsequently petitioned for $2,171,085 in attorney fees, as well as costs, contending that they were entitled to fees under the mandatory fee award provision of ORS 646.632(8) because they prevailed at trial and they had in good faith submitted a satisfactory AVC. The state objected, asserting that the AVC was not satisfactory because it "(1) did not include a promise to make restitution, (2) contained inadequate and problematic injunctive terms, and (3) offered an inadequate payment."

After a hearing, the trial court denied defendants' claim for mandatory fees under ORS 646.632(8), agreeing with the state that defendants' AVC was not satisfactory "given the state's claims and the relief that they were seeking at the time." The trial court's reasoning appears to be premised on the theory that it was reasonable for the state to litigate the case. Noting that the UTPA is subject to various interpretations and "not a lot of developed case law," the court found that, despite not prevailing, not all of the state's claims were unreasonable, there were contested legal theories involved, and the case was one that "probably needs to be litigated." The court entered a supplemental judgment denying defendants' attorney-fee statement and excluding from recoverable costs those based on defendants' claimed entitlement to fees.

Defendants contend on appeal that the trial court erred in failing to find that the AVC was satisfactory under ORS 646.632(8). In their view, the state did not have a basis to reject the AVC as unsatisfactory under ORS 646.632(3)(a), because it *did* provide for restitution, and it is undisputed that ORS 646.632(3)(b) does not apply.[29] Defendants further contend that the AVC contained injunctive provisions beyond what would be required to meet the "satisfactory" standard. Defendants point out, among other things, that they promised more in that regard than the state could attain at trial. Defendants conclude that the court applied incorrect legal standards in ruling otherwise.

In the state's view, the trial court correctly denied defendants' request for fees, as a matter of law, because the

---

[29] The parties agree that the state did not include a proposed AVC with their notice of violation, which is necessary to invoke subsection (3)(b).

AVC was not satisfactory for two reasons. First, according to the state, "[a] promise to pay a lump sum to the state to use for lawful purposes that *might* include restitution is qualitatively different from a promise 'to make restitution in specific amounts' to injured persons" as provided in ORS 646.632(3)(a). (Emphasis in state's brief.)  Second, the state argues that ORS 646.623(3) does not provide the exclusive reasons for rejecting an AVC, and the AVC was not satisfactory because it contained terms that conflict with the UTPA—proof of materiality and detrimental reliance. Alternatively, the state contends that the trial court correctly applied a "reasonableness" standard in determining that defendants' AVC was unsatisfactory.

The proper interpretation of ORS 646.632(8) is a legal question that we review for legal error. We do so, considering the text and context of the statute, as well as any useful legislative history, to determine the legislature's intent in enacting it. *Gaines*, 346 Or at 171. In full, ORS 646.632(8) provides:

> "The court may award reasonable attorney fees to the prevailing party in an action under this section. *If the defendant prevails in such suit and the court finds that the defendant had in good faith submitted to the prosecuting attorney a satisfactory assurance of voluntary compliance prior to the institution of the suit* or that the prosecuting attorney, in a suit brought under subsections (5) and (6) of this section, did not have reasonable grounds to proceed under those subsections, *the court shall award reasonable attorney fees at trial and on appeal to the defendant.*"

(Emphases added.) The state does not dispute that defendants prevailed in the action and that their AVC was submitted in good faith. It is also undisputed that the AVC was submitted "prior to institution of the suit." The question thus reduces to whether defendants' AVC was "satisfactory," within the meaning of ORS 646.632(8), such that the court was required to award defendants their reasonable attorney fees.

Because the legislature did not define the term "satisfactory," we look to its "plain, natural, and ordinary

meaning." *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993); *see also State v. Dickerson*, 356 Or 822, 829, 345 P3d 447 (2015) (same). We often consult dictionary definitions for that purpose, assuming that, if the legislature did not provide a specialized definition, "the dictionary definition reflects the meaning that the legislature would naturally have intended." *DCBS v. Muliro*, 359 Or 736, 746, 380 P3d 270 (2016). The dictionary defines "satisfactory" to mean, as relevant, "sufficient to meet a condition or obligation," and "adequate to meet a need or want." *Webster's* at 2017.

We glean two clues from the context in which the term is used, including the other subsections of the statute. *State v. Langdon*, 330 Or 72, 80-81, 999 P2d 1127 (2000) ("Context includes other provisions of the same statute ***."). First, although ORS 646.632(2) provides that an AVC is submitted to the court only if *the state* finds it satisfactory, it is evident that, for purposes of determining eligibility for mandatory attorney fees under ORS 646.632(8), the trial court must make an independent determination whether an AVC is satisfactory. To conclude otherwise would render the legislature's inclusion of the word "satisfactory" in subsection (8) meaningless surplusage; defendants' attorney fees would be a matter of prosecutorial fiat. *See State v. Clemente-Perez*, 357 Or 745, 755, 359 P3d 232 (2015) ("As a general rule, we *** assume that the legislature did not intend any portion of its enactments to be meaningless surplusage."); ORS 174.010 (instructing courts to construe statutes so as to "give effect to all" provisions). To conclude otherwise could effectively eliminate the entitlement to fees altogether; that is, a defendant who prevailed after the state deemed the AVC unsatisfactory would *never* be entitled to a mandatory award of fees. Although the initial assessment whether an AVC is "satisfactory" is the state's, the state makes that assessment under ORS 646.632(2) knowing that it may be responsible for the defendant's attorney fees if the defendant prevails and a court later disagrees with the state's assessment. ORS 646.632(8); *see* Ralph James Mooney, *The Attorney General as Counsel for the Consumer: The Oregon Experience*, 54 Or L Rev 117, 125 (1975) (observing that, "[a]lthough the Act may not oblige a prosecuting attorney to

accept a tendered assurance, it does place great pressure on him to do so," referencing the mandatory attorney fee provision now in ORS 646.632(8)).

Second, the legislature's wording and choice of verb tense in subsection (8) indicate that the court's determination, although made after trial, is based on the circumstances existing at the time the AVC was submitted, not through the lens of hindsight. Subsection (8) provides that, to be entitled to fees, court must find that the defendant "*had*" in good faith "*submitted*" a satisfactory AVC to the prosecutor "prior to the institution of the suit." We assume that the legislature's use of the past tense is deliberate. *See State v. Gonzalez-Valenzuela*, 358 Or 451, 461, 365 P3d 116 (2015) ("We do not lightly disregard the legislature's choice of verb tense, because we assume the legislature's choice is purposeful." (Internal quotation marks and brackets omitted.)).

We consider the legislative history. The parties do not offer any history of the enactment of the AVC procedure generally, or the mandatory attorney fee provision in ORS 646.632(8) in particular. What we have been able to access is sparse. Both were enacted in 1971 as part of the original UTPA, through House Bill (HB) 3037. *See* Or Laws 1971, ch 744, § 11. HB 3037 was itself the result of a composite of several other bills making their way through the legislature that session, including HB 1088 (1971), which is where the mandatory attorney fee provision now in subsection (8) originated.[30] Minutes, Senate Committee on Consumer Affairs, HB 3037, May 12, 1971, 1-2; Exhibit File, House Judiciary Committee, HB 3037, Memorandum, William R. Canessa, "Comparison of Senate Bill 50 with House Bill 1088, House Bill 1250, House Bill 1330 (DCCC) and Senate Bill 123," Mar 1, 1971.

HB 1088 was proposed at the request of then Attorney General Lee Johnson and was the product of a

---

[30] What is now in subsection (8) is substantively the same as it was when enacted, except that, as originally enacted, it did not specifically include an entitlement to fees on appeal. And, if the state prevailed, the "reasonable expenses of investigation, preparation and prosecution" were taxed against the defendant. *Compare* ORS 646.632(5) (1971) *with* ORS 646.632(8) (2019).

committee composed of labor, industry, legal, law enforcement, and lay representatives. Minutes, House Committee on Judiciary, HB 1088, Feb 10, 1971, 1. As relevant here, Attorney General Johnson explained that

> "HB 1088 sets out procedures whereby an offender would be given the opportunity to voluntarily comply with the law, within a specified period, in which case no action would be commenced against him, *and provides for payment of attorney's fees of the defending party when the defendant prevails in such actions. This provision would reduce the possibility that an irresponsible prosecutor might bring an unjustified action against an individual or firm.*"[31]

*Id*. (emphasis added). Similarly, in his written proposal, the Attorney General stated:

> "A unique provision of the bill concerns the 'assurance of voluntary compliance.' Under this procedure before a prosecutor can institute a suit against the seller, except in an emergency situation, he must first seek from the merchant an assurance of voluntary compliance. *The purpose of this section is to reduce unnecessary litigation and protect the merchant against an irresponsible prosecutor who might bring a suit solely for publicity purposes.* The merchant has 10 days in which to file an assurance of voluntary compliance. *If the prosecuting attorney then proceeds to prosecute and the court finds that the merchant had in good faith complied with the law, then the merchant can obtain attorney's fees against the state.*"

Exhibit File, House Judiciary Committee, Subcommittee on Consumer Protection, HB 1088, Attorney General Lee Johnson, "Consumer Protection Act Proposal", at 6 (emphases added).

Although it appears that the legislature did not discuss the particulars of what might be required for a "satisfactory" AVC, the history does reflect—not surprisingly—that the process was designed to reduce unnecessary litigation. More to the point, the mandatory attorney fee provision was intended to protect sellers by deterring the state from bringing "unjustified" actions.

---

[31] We quote from the minutes of the committee hearings because the audio recordings are essentially inaudible.

In this case, subsection (3) of the statute, although enacted four years after subsection (8), also informs our analysis. *Cf. Aleali v. City of Sherwood*, 262 Or App 59, 73, 325 P3d 747 (2014) ("Although amendments to ORS 197.830 do not strictly provide 'context' for the legislature's intended meaning of 'without providing a hearing' in the original version of the 1989 statute, the subsequent history of the statute is nonetheless material to our analysis."). To repeat, subsection (3) provides:

> "The prosecuting attorney may reject as *unsatisfactory* any assurance
>
> "(a)   Which does not contain a promise to make restitution in specific amounts or through arbitration for persons who suffered any ascertainable loss of money or property as a result of the alleged unlawful trade practice; or
>
> "(b)   Which does not contain any provision, including but not limited to the keeping of records, which the prosecuting attorney reasonably believes to be necessary to ensure the continued cessation of the alleged unlawful trade practice, if such provision was included in a proposed assurance attached to the notice served pursuant to this section."

(Emphasis added.)

With those terms, subsection (3) provides two permissible reasons for the state to reject an AVC as unsatisfactory. It follows that, as a matter of law, an AVC that fails in those specifics is *not satisfactory* for purposes of the court's determination under subsection (8). However, subsection (3) does not purport to be exclusive; that is, it does not provide that the prosecutor may "*only*" reject an AVC in the circumstances listed. *See* ORS 174.010. More significantly, nothing about it or the statute as a whole would permit us to conclude— by negative implication—that subsection (3) defines the universe of what constitutes a satisfactory AVC for purposes of the court's determination under subsection (8). Said another way, nothing in the statutory scheme indicates that any AVC *other than* one that is deficient in the specifics listed in subsection (3) necessarily meets the "satisfactory" standard of subsection (8). *Cf. Hays v. DMV*, 230 Or App 559,

562-63, 216 P3d 902 (2009) (noting that the statement in ORS 813.410(5)(e)—"if the driver is informed according to the statute, the breath test failure requires suspension"— does not "necessarily, as a matter of pure logic, imply its converse"—that is, "if the driver is *not* informed according to the statute, the failure does *not* lead to suspension," although, in that context, it was "strongly implied" (emphases in original; internal quotation marks omitted)).

The legislative history of subsection (3) confirms that understanding. It was added to the statute in 1975 through Senate Bill (SB) 37, again at the request of Attorney General Johnson. Or Laws 1975, ch 437, § 3. In a written summary of the bill, the Attorney General explained that what is now codified at ORS 646.632(3)

"is probably the most important provision of the bill relating to the [AVC] procedures. It has been the practice of this office where we accept an [AVC] to demand restitution be made to the injured consumer and on occasion we also insist upon the keeping of records so that we can monitor compliance with the law. The present statute, however, does not make it clear whether the Attorney General has the authority to include such requirements as part of an [AVC], although the law does provide that the court may require restitution if the matter is litigated. *The purpose of the amendments is simply to make it clear that we do have such authority*."

Appendix F at 4-5, Senate Committee on Consumer and Business Affairs, SB 37, Feb 5, 1975 (Summary of Senate Bill 37) (emphasis added). As with the text, nothing in the legislative history indicates that subsection (3) was intended to otherwise *prohibit* the Attorney General from rejecting an AVC as unsatisfactory or to so limit the court's determination in subsection (8). In short, although it provides some guidance, subsection (3) does not conclusively define what is meant by a "satisfactory" AVC for the purposes of determining a party's entitlement to attorney fees under subsection (8), and we reject defendants' argument to the contrary.

With that much in mind, we turn back to the parties' arguments. As noted, the state contends that defendants'

AVC was not satisfactory for two reasons—(1) it failed to provide for restitution as required under ORS 646.632(3)(a), and (2) it contained terms that conflict with Oregon's UTPA, thereby holding defendants to a lower standard than the UTPA requires. Neither argument is persuasive.

Beginning with the issue of restitution, paragraph 21 of the AVC provides that defendants "shall pay the sum of $250,000 to the DOJ to be used by the State of Oregon as allowed by law, *including, but not limited to, restitution*, consumer education, the Consumer Protection & Education Account established pursuant to ORS 180.095, or charitable purposes." (Emphasis added.) The state contends that the provision is insufficient to meet the requirements of ORS 646.632(3)(a)—that is, "a promise to make restitution in specific amounts or through arbitration for persons who suffered any ascertainable loss of money or property as a result of the alleged unlawful trade practice"—and, therefore, it is unsatisfactory as a matter of law.

According to the state, "[a] promise to pay a lump sum to the state to use for lawful purposes that *might* include restitution is qualitatively different than a promise 'to make restitution in specific amounts' to injured persons." (Emphasis in original.) Defendants rejoin that the AVC's provision for the payment of restitution was not tentative, as the state's argument suggests. The AVC offered a specific amount—$250,000—and it expressly authorized the state to use it to pay restitution, referencing the account established under ORS 180.095. Defendants have the better argument.

The state fails to explain precisely *why* defendants' offer was "qualitatively different" from what the statute requires. To the extent the state suggests that the restitution promise was tentative, we agree with defendants that, by its terms, it was not—it requires that defendants "*shall* pay." *See Preble v. Dept. of Rev.*, 331 Or 320, 324, 14 P3d 613 (2000) ("'Shall' is a command: it is 'used in laws, regulations, or directives to express what is mandatory.'" (Quoting *Webster's Third New Int'l Dictionary* 2085 (unabridged ed 1993).)). That the AVC also *permitted* the use of the funds for purposes *other* than restitution does not, as a matter of logic, negate defendants' agreement to pay $250,000 in

restitution. In other words, that *the state*, *at its choosing*, could use all or some of the funds for other than the payment of restitution does not mean that *defendants* failed to promise restitution in that amount.

Further, to the extent we can understand the state to argue that, to satisfy subsection (3), the AVC was required to set up a mechanism for defendants themselves to identify and pay restitution to individual injured persons, the statute's text and context does not bear that out, and the state presents no other basis for us to reach that conclusion. Notably, the statute does not reference the payment of restitution "to" specific persons, it requires a promise of restitution "for" persons who suffered an ascertainable loss as a result of the unlawful practice.

Moreover, ORS 180.095(1) establishes the Department of Justice Protection and Education Revolving Account. Generally, any money received by the department under an AVC, including restitution, is to be credited to that account. ORS 180.095(3). And, the funds from the account may be used by the department to pay restitution in a proceeding under the UTPA. ORS 180.095(1)(a). *If* the department "cannot determine the persons to whom the restitution \*\*\* should be paid or the amount of the restitution \*\*\* payable to individual claimants is de minimis," the funds are then deposited in the General Fund. ORS 180.095(4).

In a case such as this, involving a small-scale consumable product, in which it may be difficult, if not impossible, to identify specific individuals who may have been injured by the alleged violation, and in the absence of any argument by the state that the restitution *amount* promised was inadequate,[32] we fail to see how defendants' promise to pay the sum of $250,000, for the state to use for restitution, referencing the account established pursuant to ORS

---

[32] The state does not argue on appeal, as it did below, that the *amount* of restitution provided in the AVC was insufficient and that the trial court should have concluded that the AVC was not satisfactory for *that* reason. Moreover, we decline to infer such an argument from the state's attempt to refute defendants' suggestion that their exposure to liability for restitution was limited to Decaf 5-HE (of which a very small amount was sold in Oregon), when the state does not endeavor to make that argument itself.

180.095,[33] is an insufficient "promise to make restitution in specific amounts * * * *for* persons who suffered any ascertainable loss of money or property as a result of the alleged unlawful trade practice." (Emphasis added.)

We are also not persuaded by the state's second argument—that the AVC was not satisfactory because it was contrary to Oregon law. The state contends that defendants' promise in paragraph 12 to decline from making *material* misrepresentations or omissions about 5-HE that consumers would *reasonably rely on to their detriment* would hold defendants to a less demanding standard than what is required under the UTPA. However, even assuming the correctness of that premise,[34] the AVC contains other provisions that effectively neutralize any conflict. Paragraph 11 of the AVC states that defendants will obey the UTPA in its entirety—"[defendants] shall obey Oregon's Unlawful Trade Practices Act, ORS 646.605 to ORS 646.656." In addition—and significantly—the AVC also contains a severability clause, paragraph 29, which provides, in relevant part:

> "The Parties further acknowledge that this AVC constitutes a single and entire agreement that is not severable or divisible, *except that if any provision herein is found to be legally insufficient or unenforceable, the remaining provisions shall continue in full force and effect*."

(Emphasis added.) Thus, to the extent paragraph 12 conflicts with Oregon law, it would be "legally insufficient or unenforceable," and paragraph 11, requiring defendants to obey the UTPA, would "continue in full force and effect." And, the state could apply to the court for recovery of substantial civil penalties for any willful violation of that provision. ORS 646.642(2). Thus, we conclude that defendants' AVC does not fail that test for either of the "matter of law" reasons that the state asserts.

---

[33] Although the AVC misidentifies the precise *name* of the account established under ORS 180.095(1), that discrepancy does not affect our analysis.

[34] We have concluded in this opinion that materiality *is* an element of the UTPA violations asserted in this case, *see* 313 Or App at 196-97); it is fair to say, however, that the law in that regard was unsettled at the time the AVC was submitted.

Finally, we address the state's alternative argument that the trial court properly found that the AVC presented in this case was not satisfactory because it was "reasonable" for the state to have rejected it and proceeded to trial. The problem with that approach is that it does not comport with the text of the statute nor with what we know of the legislative history. As noted, the plain meaning of "satisfactory" is "sufficient to meet a condition or obligation," or "adequate to meet a need or want." *Webster's* at 2017. Given the undisputable purpose underlying the UTPA, the obligation or need at issue here is consumer protection. *See* 313 Or App at 185 (discussing the purposes of the UTPA). In other words, the standard by which an AVC must be measured is in its "adequacy" or "sufficiency" in protecting consumers from unlawful practices. Likewise, the legislative history indicates that including a threat of liability for attorney fees in the AVC scheme was designed to deter the state from bringing "unjustified" actions. Again, given that the underlying purpose of the UTPA is consumer protection, assessing whether the state is "justified" (*i.e.,* "prove[n] or show[n] to be just, desirable, warranted, or useful," *Webster's* at 1228) in rejecting an AVC and pursuing an action logically must be considered in light of that purpose. And that, of course, is qualitatively different from assessing, as the trial court did here, whether the state's claims were "reasonable" or whether the state made a "reasonable" choice to proceed to trial.

Having rejected the state's legal arguments in support of the trial court's conclusion that the proffered AVC was not satisfactory, we conclude that the trial court erred in denying defendants reasonable attorney fees and limiting the cost award on that basis. Therefore, we reverse and remand the supplemental judgment.

## IV.   CONCLUSION

With respect to the state's appeal, we conclude that the trial court did not err in entering judgment for defendants on the state's UTPA claims. We affirm the general judgment. With respect to defendants' cross-appeal, we conclude that the court erred in denying defendants' petition for attorney fees under ORS 646.632(8). We reverse and remand the supplemental judgment for a determination

of the amount of reasonable attorney fees and costs due defendants.

On appeal, general judgment affirmed; on cross-appeal, supplemental judgment reversed and remanded.